UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

SHERRY ANN ALLISON,              )
                                 )
            Plaintiff,           )
                                 )
      v.                         )        No. 2:09 CV 35 JCH/DDN
                                 )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
            Defendant.           )

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

  This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Sherry Ann Allison for disability insurance
benefits under Title II of the Social Security Act, and supplemental
security income under Title XVI of the Social Security Act, 42 U.S.C.
§ 401, <u>et seq.</u>  The action was assigned to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28
U.S.C. § 636(b).  For the reasons set forth below, the undersigned
recommends that the ALJ's decision be affirmed.

**I.  BACKGROUND**

  Plaintiff Sherry A. Allison was born on September 11, 1959.  (Tr.
25.)  She is 5'3" tall, with a weight that has ranged from 204 pounds
to 222 pounds.  (Tr. 73, 471.)  She completed high school and received
an associate's degree after two years of college. (Tr. 631, 665.)  She
is divorced and has one child.  (<u>Id.</u>)  She last worked as a customer
service representative in a mail order warehouse.  (Tr. 74.)

  On May 3, 2005, Allison applied for disability insurance benefits
and supplemental security income, alleging she became disabled on April
18, 2005, due to fibromyalgia.  (Tr. 73.)  She also complained of
asthma, diabetes, and gastroesophageal reflux disease (GERD), but noted
that those impairments did not keep her from working.  (Tr. 73-74.)  She
received a notice of disapproved claims on June 22, 2005.  (Tr. 9.)

After a hearing on March 13, 2007, the ALJ denied benefits on May 15, 2007. (Tr. 6-21, 663-709.)  On May 15, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 2-4.)

## II.  ADMINISTRATIVE RECORD

On June 16, 2004, doctors reviewed x-rays of Allison's hip, after a recent fall.  The x-rays showed no evidence of a fracture or dislocation, and no other significant bony abnormalities were noted. The x-ray showed a normal left hip.  An x-ray of the left femur and right ankle were also normal.  (Tr. 223-25.)

On June 21, 2004, Allison saw Dr. Justin Jones, M.D., her primary care physician, complaining of depression and anxiety.  Allison had been taking Trazodone, Lorazepam, and Zoloft in the past, but took herself off them six months earlier, because she was doing well.[1]  Allison had recently quit her job, even though she liked it, because it stressed her out.  She was now having financial stresses.  She was helping family members with jobs to make some money.  She had no suicidal thoughts, and stated she would never be able to commit suicide because of her daughter.  Dr. Jones diagnosed her with hyperlipidemia, depression and anxiety, which was symptomatic, but non-suicidal, and GERD.[2]  (Tr. 143-45.)

On July 2, 2004, Allison saw Dr. Jones, for a follow-up of her depression and anxiety, and a sore right breast.  Allison was taking Zoloft and Lorazepam, and was doing well on those drugs, with no depression or anxiety.  She did not report having any suicidal thoughts. Dr. Jones diagnosed her with GERD, symptomatic on Zantac, but responding

_____

[1]Trazodone and Zoloft are used to treat depression.  Lorazepam is used to treat anxiety.  WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

[2]Hyperlipidemia is the presence of an abnormally large amount of lipids in the circulating blood.  Stedman's Medical Dictionary, 741, 884 (25th ed., Williams & Wilkins 1990).

well on Prevacid.[3]  He also diagnosed her with depression and anxiety, but doing well with the current treatment.  He recommended that she continue her current mental health treatment.  She was to return in two months, or as necessary.  (Tr. 141-42.)

On September 2, 2004, George Cyriac, M.D., reviewed an x-ray of Allison's chest.  The x-ray showed Allison's heart was a normal size, and pulmonary vascularity was unremarkable.  There were no acute infiltrates or pleural effusions.[4]  There might be minimal atelectatic changes, but otherwise, it was a normal chest x-ray.[5]  (Tr. 221.)

On December 22, 2004, Allison saw Dr. Jones for refills.  Allison stated her asthma, depression, and anxiety were stable.  She was still smoking and obese, and recognized that she needed to lose weight.  Dr. Jones offered Allison counseling to help her deal with her father, but she declined.  She had no chest pain, heart trouble, breathing complaints, stomach complaints, leg swelling, or dizziness.  Dr. Jones diagnosed her with nonocclusive coronary artery disease, hypercholesterolemia, hypertension, stable asthma, stable depression and anxiety, tobacco abuse, and obesity.[6]  He recommended weight loss and a low-fat, low-cholesterol diet.  He also discussed the effects of smoking, and how she absolutely needed to stop smoking.  (Tr. 133-34.)

On January 7, 2005, Allison saw Dr. Jones, complaining of coughing.  She was still smoking.  Dr. Jones diagnosed her with asthma exacerbation, bronchitis, tobacco abuse, and diabetes.  He strongly

---

[3]Zantac is used to treat stomach ulcers.  Prevacid is used to treat stomach ailments such as GERD.  WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

[4]Pleural effusion is excess fluid that accumulates in the pleural cavity, the membrane lining that envelops the lungs.  Stedman's Medical Dictionary, 491, 1215.

[5]Atelectasis is the absence of gas from the lungs due to failure of expansion or resorption of gas.  Stedman's Medical Dictionary, 147.

[6]Coronary artery disease (CAD) occurs when the arteries that supply blood to the heart muscle become hardened and narrowed from the buildup of cholesterol and other material on their inner walls.  MedLine Plus, http://www.nlm.nih.gov/medlineplus/coronaryarterydisease.html (last visited April 27, 2010).

recommended that she and her fiancé stop smoking, and lectured them about the side-effects of smoking. Allison was not interested in stopping. (Tr. 131-32.)

On February 9, 2005, Allison saw Dr. Jones, complaining of depression and anxiety, leg pain, back pain, diabetes, and hypertension. She believed she was doing okay with the depression and anxiety. An examination showed Allison was in no distress, and that she jumped from one complaint to the next. Her neck was supple and lungs were clear. Her back was nontender to gentle palpation. Dr. Jones diagnosed her with hypercholesterolemia, hypertension, diabetes, leg pain – arthralgia, skin lesions, and depression/anxiety, though Allison claimed she was asymptomatic.[7] Dr. Jones did not consider Allison suicidal. He prescribed hydrocortisone cream for her skin, Tylenol or Vicodin for her arthralgia, and Lovastatin for her cholesterol.[8] He advised her to watch her sugars, and to call if she suffered from any depression or anxiety. (Tr. 129-30.)

On April 6, 2005, Allison saw Dr. Jones complaining of back and neck pain. An examination showed a well-nourished white female in no distress. Her lungs were clear and she had a regular heart rate and rhythm, without murmur. Her abdomen was soft and non-tender, with normoactive bowel sounds. She had no cyanosis or clubbing in the extremities, and her spine was "not really that tender." Dr. Jones diagnosed her with chronic neck and back pain, possibly from fibromyalgia or other causes.[9] He found no evidence of any neurologic

_____

[7]Arthralgia is severe joint pain, but not inflammatory. Stedman's Medical Dictionary, 134.

[8]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain. Lovastatin is used to lower cholesterol in the blood. WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

[9]Fibromyalgia is a condition that causes fatigue, muscle pain, and "tender points." Tender points are places on the neck, shoulders, back, hips, arms or legs that hurt when touched. Fibromyalgia is also associated with morning stiffness and headaches, and difficulties sleeping, thinking, and remembering. The cause of fibromyalgia is unknown, and there is no cure. Medicine, sleep, and exercise may help
(continued...)

deficits. He also diagnosed her with elevated blood pressure, which he contributed to her emotional upset. Dr. Jones referred Allison to physical therapy, and recommended Tylenol or Percocet for her pain.[10] (Tr. 124-25.)

On April 19, 2005, Tim Propeck, M.D., reviewed x-rays of Allison's knees, pelvis, chest, and lumbar spine. The x-ray of the knees revealed minimal degenerative changes in the medial compartments of both knees. The x-ray of the pelvis revealed a small amount of hardened tissue around both the pelvis and hip joints, and showed that the joints around the femur and hip were relatively well preserved. The x-ray of the chest revealed atelectasis in the right middle lobe, but otherwise, the lungs were clear and the heart was not enlarged. (Tr. 215-17.)

On April 19, 2005, Allison saw Deanna Davenport, APRN, FNP, complaining of pain in her hips and knees. A musculoskeletal examination showed Allison had no swelling or tenderness in the small joints of her hands and wrists. She had no elbow tenderness or reduction in range of motion. Her lateral epicondyles were tender, and the pain was worse when her hands were supine.[11] Her left shoulder showed tenderness and pain with movement, but exhibited full range of motion. She had 12/18 fibromyalgia tender points. Her back was tender diffusely, particularly her lower back. She had no hip pain, and no swelling in her knees or ankles. X-rays of the chest showed the lungs were clear, and x-rays of the lumbar spine showed no fractures and revealed that the disk spaces were relatively well preserved. An x-ray of the knees showed minimal degenerative changes in the medial compartments of both knees. An x-ray of the pelvis showed a small

_____

[9](...continued)
ease the symptoms of fibromyalgia. Medline Plus, http://www.nlm.nih.gov/ medlineplus/fibromyalgia.html (last visited April 27, 2010).

[10]Percocet is an opiate-type medication, used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

[11]Lateral epicondylitis, or Tennis elbow, refers to an infection or inflammation of the epicondyles, the tendons near the elbow. Stedman's Medical Dictionary, 521.

amount of hardened tissue, but both femoral acetabular joints were relatively well preserved. Allison was diagnosed with arthralgias, even though, "on physical exam, these are not noted to be particularly painful with use, and no swelling is noted." She was also diagnosed with myalgias, lateral epicondylitis, and sleep apnea, all of which suggested fibromyalgia.[12] Dr. Darcy Folzenlogen prescribed Ultram, Flexeril, advised Allison to obtain forearm supports, and suggested a sleep study and physical therapy with hydrotherapy.[13] (Tr. 236-39.)

On April 21, 2005, Allison went to physical therapy. Sean Ellis, PT, completed an assessment. In his opinion, Allison required skill rehabilitative therapy, and her potential for rehabilitation was fair. Clinical findings were consistent with a musculoskeletal pattern of impaired joint mobility, motor function, muscle performance, and range of motion. Ellis found Allison displayed signs of fibromyalgia, which limited her tolerance for work-related sitting. Ellis recommended Allison attend therapy twice a week, for four weeks. (Tr. 104-08.)

On April 28, 2005, Allison went to physical therapy. She was complaining of pain, aggravated by sitting for prolonged periods. Allison noted that her work was not able to provide ergonomic changes, and that she was thinking of applying for short-term disability. A range of motion test showed she was severely limited in her gross assessment. Ellis planned to advance and accelerate her active range of motion activities. (Tr. 100-01.)

On May 3, 2005, Allison completed a disability report, stating that fibromyalgia prevented her from working. Allison noted that her impairments first bothered her on October 27, 2004, and that she became unable to work on April 18, 2005. At the time, Allison was taking Albuterol, Flovent, and Singulair for her asthma, Cyclobenzaprine and Tramadol for her fibromyalgia, Furosemide for fluid, Ibuprofen for pain, Lisinopril for blood pressure, Lorazepam for anxiety, Lovastatin,

_____

[12]Myalgia is muscle pain. Stedman's Medical Dictionary, 1009.

[13]Ultram is used to relieve moderate pain. Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms. WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

Metformin for her diabetes, Potassium Chloride, Prilosec for reflux disease, Trazodone for sleep, and Zoloft for depression.[14]  The Albuterol gave Allison dry mouth, and the Tramadol gave her bad breath, but otherwise, the drugs had no side effects.  (Tr. 73-82.)

On May 3, 2005, Allison saw Dr. Jones, who diagnosed her with pain in her arms, legs, hips, and lower back.  Allison indicated she smoked a pack a day.  (Tr. 110.)

On May 3, 2005, Allison saw Dr. Folzenlogen and Nurse Practitioner Davenport.  Allison stated her pain was no better, but appeared more comfortable during the exam.  A social history revealed Allison smoked less than a pack a day, lived with her daughter and fiancé, and that she was "seeking a short term disability."  A musculoskeletal examination showed no swelling or tenderness in the joints of her hands or wrists. She had no elbow tenderness or reduced range of motion, but she had tender lateral epicondyles.  Her back was diffusely tender, and flexion of the hips created more back pain.  She had 12/18 fibromyalgia tender points.  Her ankles and knees showed no evidence of swelling.  Dr. Folzenlogen attributed Allison's pain to fibromyalgia, and also diagnosed her with sleep apnea, an abnormal chest x-ray, arthralgia in her knees, headaches, diabetes, and hypertension.  (Tr. 112-15.)

On May 3, 2005, Dr. Folzenlogen signed a rehabilitation service request form.  She recommended outpatient care, specifically physical therapy with hydrotherapy and soft-tissue release.  (Tr. 393.)

---

[14]Albuterol is used to prevent and treat wheezing and shortness of breath caused by breathing problems, such as asthma or chronic obstructive pulmonary disease.  Flovent is a corticosteroid that works directly in the lungs to make breathing easier by reducing the swelling and inflammation of the airway.  Singulair is used to treat or prevent asthma.  Cyclobenzaprine is a muscle relaxant used to treat muscle pain and spasms.  Tramadol is used to relieve moderate pain.  Furosemide, or Lasix, is a diuretic, and is used to treat high blood pressure. Ibuprofen is an anti-inflammatory drug used to relieve pain and swelling.  Lisinopril is used to treat high blood pressure.  Metformin is used to control high blood sugar.  Potassium Chloride is a mineral supplement used to prevent or treat low amounts of potassium in the blood.  Prilosec is used to treat stomach and throat problems caused by too much stomach acid.  WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

On May 3, 2005, Allison participated in physical therapy for forty-five minutes. She noted that her pain was 8/10 before and after the therapy. (Tr. 247.)

On May 18, 2005, Allison participated in many physical therapy sessions; she had not skipped or cancelled at all. (Tr. 366A-91.)

On May 25, 2005, Allison completed a function report. She lived in a house, with family members. In a typical day, she woke her daughter, Amanda, for school. Amanda helped Allison prepare breakfast, get dressed, and comb her hair. It might take her five or ten minutes to get dressed. From there, Allison drove an hour to Columbia for her physical therapy appointments. After driving home, she was usually shaking all over, and weak. She might grab some cheese and crackers, take her pain pills, and then nap for an hour. Her daughter prepared dinner and helped her with any laundry. After dinner, Allison went walking with her daughter and her fiancé. Her daughter helped her shower, and reminded her to take her medication. (Tr. 48, 56.)

Her daughter also helped her fasten her bra, and get in and out of the bathtub. If her arms and shoulders were hurting, her daughter brushed her hair. Allison could make a sandwich, but needed her daughter's help to make a complete meal. She cleaned some of the dishes, but only if there were not too many. Her fiancé handled any outside chores. Allison could drive by herself, but only drove to her doctor appointments and physical therapy with any frequency. Her physical therapy sessions had been cut to twice a week, because of her pain and fatigue. Allison's impairments affected her ability to perform almost all activities. She could only lift five pounds without straining her muscles, could not stand for longer than fifteen minutes without having pain in her back and legs, and could not sit for longer than thirty or forty-five minutes, because it hurt her knees and back. She also noted problems reaching, using her hands, completing tasks, and getting along with others. (Tr. 49-58.)

On May 25, 2005, and March 7, 2007, Allison completed a work history report. Her earliest job had been as an assistant manager at a restaurant, but she could not remember her dates of employment. She worked as an assistant teacher and cook for Head Start, from June 1996

to May 2000.  She worked forty hours a week at Head Start, but reported leaving because there were not enough hours.  As part of the job, she prepared food in an oven and prepared activities for the children.  She frequently lifted no more than ten pounds.  She worked in customer service and returns for Brookstone, from June 2000, until May 2004.  She worked between forty and sixty hours a week.  As part of the job, she answered customer phone calls, and issued refunds.  She lifted up to twenty pounds, but frequently lifted no more than ten pounds.  She sat for six to eight hours a day.  She reported leaving because of stress and health, noting that she had to work sixty hours a week during the busy season.  From June 2004 to April 2005, she worked in customer service at Graf.  She worked forty-four hours a week, and spent most of the day sitting in a chair, answering phone calls.  She lifted up to twenty pounds, but frequently lifted less than ten pounds.  She left because of her health.  (Tr. 59-69, 74-75, 91.)

On May 25, 2005, Allison saw Dr. Jones, complaining of diabetes and water retention.  She had no other complaints; she reported no problems with chest pain, breathing, or her stomach.  An examination showed Allison was in no distress, and she appeared happy and in a good mood.  She had a slight wheezing in her lungs, but this appeared to be her baseline.  Dr. Jones diagnosed her with lower extremity edema in both legs, and diabetes.  He increased her prescription of Lasix and continued her other medications.  He offered her support hose, but she declined.  Allison was to return in three months, or sooner if she had complaints.  (Tr. 254-55.)

On June 9, 2005, Allison participated in physical therapy.  According to the notes, Allison reported that she was unable to tolerate even minimal daily living activities.  She rated her pain as 8/10 before and after treatment.  (Tr. 383.)

On June 22, 2005, Sheila Oligschlaeger completed a physical residual functional capacity assessment.  In the assessment, Oligschlaeger found Allison had the capacity to occasionally lift ten pounds, frequently lift ten pounds, stand and/or walk for six hours in an eight-hour workday, and sit for about six hours in an eight-hour

workday.  Oligschlaeger found Allison's complaints only partially credible.  (Tr. 259-66.)

On June 23, 2005, Allison went to the emergency room, complaining of shoulder, arm, hand, and back pain.  An initial assessment found her alert, in no acute distress, but anxious.  Later that day, she was discharged home, in improved condition.  (Tr. 269-75.)

On July 21, 2005, Nurse Practitioner Davenport completed a medical report for the Missouri Department of Social Services.  The report noted that Allison suffered from fibromyalgia, asthma, diabetes, and GERD. According to Davenport, Allison did not have the ability or stamina to work because of the muscle pain.  Standing, sitting, lifting, bending and even interacting with others were difficult tasks.  Davenport marked that Allison had a disability which could be expected to last twelve months or longer.  (Tr. 276-77.)

On August 24, 2005, Allison participated in physical therapy.  She had also participated on August 10, August 15, and August 22.  Her pain was 7/10, 7/10, and 8/10, respectively during these visits.  (Tr. 416.)

On August 24, 2005, Allison saw Dr. Jones, for a follow-up of her diabetes and fatigue.  She had her last session of physical therapy before her insurer cut her off.  Allison reported feeling a little depressed and anxious, but with no suicidal thoughts.  She also noted that she was bruising easily.  Her sugars were doing well, and she reported no complaints with her chest, breathing, stomach, leg swelling, dizziness, or urinary or bowel movements.  A physical examination showed Allison was not in distress, but that she felt tired.  Dr. Jones diagnosed her with diabetes, fatigue, depression and anxiety, hypercholesterolemia, easy bruising, and GERD.  Dr. Jones noted that her blood sugar seemed to be doing well, that her depression and anxiety was somewhat symptomatic, that he did not see any bruises, and that her GERD was doing okay overall.  Dr. Jones recommended increasing her dose of Paxil to help with her depression, anxiety, and fatigue, and scheduled her follow-up for three months.[15]  (Tr. 422-23.)

_____

[15]Paxil is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress
(continued...)

On August 26, 2005, Nurse Practitioner Davenport completed a final report. Allison had been suffering from fibromyalgia for the past eight months, and was being treated with sleep medication, stretching, physical therapy, and Ultram. A recent sleep study showed no signs of apnea. Allison reported that things felt worse, but her appearance was calmer; she was no longer wringing her hands, rocking, or crying. She was working to cut back on family obligations that were causing her stress. She continued to have memory problems. At the time, she was living with her daughter, and engaged. She was taking Singulair, Lovastatin, Zoloft, Lisinopril, Albuterol, Glucophage, Prilosec, Flovent, Lorazepam, Trazodone, Flexeril, and Tramadol.[16] A physical examination showed Allison was experiencing a lot of allodynia, with 18/18 tender points.[17] She had no joint swelling. She had mild tenderness in the right wrist and limited range of motion in her shoulder, but her hips, knees, ankles, and toes were nontender. Davenport diagnosed her with fibromyalgia, diabetes, hypercholesterolemia, and asthma. Despite Allison's belief her fibromyalgia was worsening, Davenport saw signs of improvement. Her diabetes was stable and her asthma was doing quite well. (Tr. 470-72.)

On August 30, 2005, an MRI of the brain showed no suspicious pattern in the nasopharynx, and no suspicious pattern of enhancement involving the brain parenchyma. An MRI of the cervical spine showed limited degenerative changes, no high grade compression of the thecal sac, and no suspicious cord signal. (Tr. 537-39.)

On September 23, 2005, Nurse Practitioner Davenport did not think any changes to Allison's medication would improve her condition. She

---

[15](...continued)
disorder. WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

[16]Glucophage is used to control high blood sugar. Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms. WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

[17]Allodynia is the distress resulting from painful stimuli. Stedman's Medical Dictionary, 47.

advised her to work on her coping mechanisms and to start her new exercise program. (Tr. 475.)

On September 26, 2005, Allison completed an intake questionnaire for a mental health visit. She complained of depression and anxiety, and had recently split up with her fiancé. She had a painful childhood; one brother was an addict and another brother had recently been released from jail. Her father continued to abuse her emotionally. Allison indicated she needed help with depression and anxiety, and that she also suffered from chronic pain and chronic memory problems. Allison was diagnosed with major depressive disorder, which was recurrent and severe, assigned a GAF score of 50, and noted to suffer from abandonment anxiety.[18] (Tr. 278-86.)

On October 15, 2005, Allison saw Veneta Raboin, RN, CS, AP/MHCNS, for a psychiatric evaluation. A mental status examination showed Allison was alert and oriented. She denied any suicidal ideation, but reported self-mutilation through pulling her eyelashes out. She had been doing this for several years. She denied any anxiety or paranoia, but isolated herself from friends. She had a good relationship with her daughter, and reported going to two church youth groups. She denied any current problems with alcohol, but continued to smoke a pack a day. Raboin diagnosed Allison with severe major depressive disorder, and panic disorder without agoraphobia.[19] She ruled out bipolar disorder and

---

[18]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[19]Agoraphobia is an irrational fear of leaving the familiar setting of home, so pervasive that a large number of external life situations are entered into reluctantly or are avoided. Stedman's Medical Dictionary, 37.

the memory problems.  She assigned Allison a GAF score of 50[20], prescribed Cymbalta, Paxil, Lorazepam, and Trazodone, and advised her return to the clinic in a month.[21]  (Tr. 287-89.)

On October 26, 2005, Allison saw Nurse Practitioner Davenport.  She was having a lot of allodynia, with 18/18 tender points, but no joint swelling.  She had sharp tenderness over her right epicondyle, and generalized tenderness down her forearm and elbow.  Davenport diagnosed Allison with lateral epicondylitis and fibromyalgia, though she noted the fibromyalgia "actually looks fairly stable except for her arm flareup."  Allison was sleeping ok and the stress related to her fiancé had resolved somewhat.  She had not started her walking program.  Her asthma was doing better on the Prednisone.  (Tr. 476-78.)

On December 12, 2005, Allison saw Dr. Jones for a follow-up.  Allison complained about her arm feeling sore, but declined to set up an appointment to address it.  Allison was still smoking, but reported no chest pain, no breathing trouble, no abdominal pain, no leg swelling, no dizziness, and no urinary or bowel movements.  A physical examination showed she was in no distress, her lungs were clear, her abdomen was soft and nontender, and she had no clubbing or edema in the extremities.  Dr. Jones diagnosed her with hyperlipidemia, obesity, low bone density, diabetes, and tobacco abuse.  Dr. Jones recommended she work to lose one or two pounds a week, quit smoking, and start taking calcium.  (Tr. 432-33.)

On December 22, 2005, Nurse Practitioner Davenport wrote a "To Whom It May Concern" letter.  In the letter, Davenport noted that Allison had severe difficulty with physical activities of all kinds, and that she had been disabled since April 19, 2005.  (Tr. 291.)

On February 5, 2006, Nurse Practitioner Davenport diagnosed Allison with fibromyalgia and neck pain.  Her headaches were gone and she was sleeping okay.  She had started seeing a counselor she liked, and her affect was quite improved since her last visit.  (Tr. 486-88.)

---

[20]The original, handwritten number is illegible.  To the right of the number is written: "past 50."  (Tr. 289.)

[21]Cymbalta is used to treat major depression and anxiety.  WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

On March 3, 2006, Allison saw Ravi Yarlagadda, M.D., complaining of headaches. A neurological examination showed Allison was alert and oriented, with attention and concentration intact. Her language was fluent and showed good comprehension. (Tr. 505-08.)

On March 31, 2006, Dr. Cyriac reviewed an x-ray of Allison's cervical spine, after she had recently fallen. The x-ray showed no evidence of any bony injury or focal disk herniation. There was normal alignment and no other significant abnormality except for slightly enlarged lymph nodes. (Tr. 306.)

On April 18, 2006, Dr. Cyriac reviewed x-rays of Allison's thoracic, cervical, and lumbar spine. The x-ray of her thoracic spine revealed mild scoliosis and spondylosis of the spine.[22] The x-rays of her cervical and lumber spine were normal. (Tr. 448-50.)

On June 9, 2006, an MRI of the cervical spine showed minimal degenerative disk changes without significant compromise of the spinal canal or neural foramina. There was no significant progression of disk or degenerative disease. (Tr. 545-46.) An MRI of the brain revealed no acute intracranial process, and no evidence of any abnormal enhancement or enhancing lesions. (Tr. 547-48.)

On June 26, 2006, Allison received mental health treatment. She was crying, depressed, lonely, and felt little self worth. She did not report any suicidal or homicidal thoughts. She reported fishing and reading for her leisure activities. Her financial situation was difficult; she was only receiving welfare, and was unable to pay her bills. She found it difficult to be around people, and household chores were difficult. Finding money to pay her bills, going into public places, and dealing with her back pain caused her the most stress. She ranked her current stress as 10/10 and her physical pain as 7/10. Allison was diagnosed with major depressive disorder and anxiety disorder, and was assigned a GAF score of 45. In the level of care determination, the clinician believed Allison needed low intensity community-based services such as outpatient therapy or psychiatry

---

[22]Scoliosis is lateral curvature of the spine. Stedman's Medical Dictionary, 1394. Spondylosis is the stiffening or fixation of the joints within the vertebra. Id., 1456.

services alone.  Among the six levels of care, Allison was assigned the second-lowest in terms of severity.  The treatment forms were completed by Steve Smith, LCSW, and were reviewed and approved by John Hall, M.D. (Tr. 307-19.)

On July 17, 2006, Allison saw Steve Smith at Arthur Center for treatment of her depression and low self worth.  She had recently gone on a two-day outing to Springfield with her daughter.  She had a good time.  During the counseling session, Allison complained of increased physical pain after having done yard work.  She was still emotional after recently breaking up with her fiancé.  According to Smith, Allison appeared more relaxed and confident about being out in public.  (Tr. 333.)

On September 5, 2006, Allison saw Dr. Jones for a follow-up.  Her anxiety and depression were a continual problem, and she still picked at her eyelashes.  She had no suicidal thoughts.  She also suffered from diarrhea, which her psychiatrist thought was related to her anxiety. Dr. Jones offered to refer her to a gastroenterologist, but she refused. Allison had no other complaints.  She had recently volunteered at a concession stand, but after working there for a while, she really ached. Dr. Jones diagnosed her with hyperlipidemia, improved with Zetia, diabetes, stable edema in each leg, and anxiety and depression followed by psychiatry.[23]  (Tr. 443-44.)

On October 25, 2006, Allison saw Robert B. Fisher, D.O., and Amtul J. Sami, M.D., at the Anesthesiology Pain Management Clinic.  She noted suffering from pain for the last two and a half years.  She rated her pain as 8/10 at the time of the visit.  (Tr. 570-71.)

On October 26, 2006, Allison saw Dr. Fisher, complaining of shoulder and neck pain, and headaches.  An MRI of the cervical spine showed minimal degenerative disk changes without significant compromise of the spinal canal or neural foramina.  There was no significant progression of disk and degenerative disease.  A mental status examination revealed her mood was flat, but that she was alert and

---

[23]Zetia is used to lower cholesterol in the blood.  WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

oriented. Allison appeared agitated and irritable, but appeared to have normal recall abilities and normal speech. (Tr. 532-34.)

On November 17, 2006, Allison saw Nurse Practitioner Davenport, complaining of lower back pain. Davenport diagnosed Allison with fibromyalgia, but found it stable, and noted she had been getting along okay until her back spasms started. Her sleep was improved, and her mood was stable. (Tr. 492-95.)

On November 17, 2006, an MRI of Allison's shoulder showed mild tendonosis and inflammation in the rotator cuff, but no fracture, dislocation, or other bony abnormality. (Tr. 549, 552.)

On November 27, 2006, Allison saw Smith at Arthur Center. She complained of depression and a lack of assertiveness. She noted physical discomfort and headaches. (Tr. 328.)

On December 6, 2006, James R. Northern, Sr., D.O., reviewed x-rays of Allison's right knee and lumbar spine after a recent fall. The x-ray of the knee showed no evidence of any fracture or bone destruction, but there were some early degenerative changes. The x-ray of the lumbar spine showed minimal scoliosis and degenerative changes, but no spondylolisthesis.[24] There was normal alignment of the sacrum and coccyx, and no acute abnormalities. (Tr. 323-24.)

On December 22, 2006, Allison saw Smith for mental health treatment at Arthur Center. The treatment addressed her depression and lasted fifty minutes. She noted feeling less physical stiffness and pain. The notes indicate Allison was feeling more relaxed and was not crying. (Tr. 326.)

On December 28, 2006, Allison saw Dr. Yarlagadda for a follow-up. A mental status examination showed Allison was alert and oriented. Her attention and concentration were intact, and her language was fluent, with good comprehension and repetition. Her cranial nerves showed full range. She had full motor strength in all four extremities, but continued to have pain in her right shoulder. Dr. Yarlagadda diagnosed her with headaches and scheduled allergy testing. He recommended an

---

[24]Spondylolisthesis is the forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. Stedman's Medical Dictionary, 1456.

injection for her rotator cuff tendonitis and bursitis, but was unable to give the injection because of insurance problems. (Tr. 525-26.)

On January 9, 2007, an x-ray of Allison's chest showed the lungs were clear and her heart size was normal. There was no evidence of any cardiopulmonary process. (Tr. 555.)

On January 19, 2007, Allison had surgery to correct her sinusitis and severe headaches. She tolerated the procedure well, with little difficulty. Allison wished to return home, and the hospital staff allowed her to do so. (Tr. 454-60.)

On January 30, 2007, Allison reported that the trigger point injection she received had not helped her shoulder pain. (Tr. 501.)

On February 2, 2007, Allison completed a disability report appeal. She had recently gone to the emergency room because of pain stemming from fibromyalgia and sunburn. Allison noted that she was having more trouble remembering things. At the time, she was taking Albuterol, CodiClear, Flexeril, Flovent, Glucophage, Levaquin, Lisinopril, Lorazepam, Lovastatin, Percocet, Prednisone, Robitussin, Singulair, Tramadol, Trazodone, Vicodin, and Zoloft.[25] The drugs did not produce any significant side effects. (Tr. 82-88.)

On February 12, 2007, Allison saw Smith for mental health treatment. The treatment addressed her depression and low self-esteem, and lasted an hour. (Tr. 325.)

On February 19, 2007, Steve Smith completed a medical assessment form. He noted that Allison cried easily, had low self-esteem, and withdrew from people when stressed. He believed she had poor or no ability to (1) deal with work stresses, (2) understand, remember, and carry out complex job instructions, (3) behave in an emotionally stable manner, and (4) relate predictably in social situations. He also noted

---

[25]CodiClear is used for temporary relief of coughs that are caused by certain infections of the air passages (like bronchitis or sinusitis). Levaquin is used to treat a variety of bacterial infections. Prednisone is a hormone that decreases the immune system's response to various diseases as a way of reducing symptoms such as swelling and allergic reactions. Robitussin is used to temporarily treat coughing and chest congestion symptoms caused by the common cold, flu, or illnesses like sinusitis or bronchitis. WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

that she had difficulty following through on tasks because of her physical discomfort and preoccupation.  Dr. Hall also signed the form underneath Steve Smith's signature.  (Tr. 364-65.)

On March 7, 2007, Allison completed a medical treatment form.  She listed her primary doctor as Dr. Justin Jones, and listed Deanna Davenport, Dr. Yarlagadda, Dr. Kane, Dr. A.L. Barrier, Steve Smith, and Venita Rabain as her other doctors.  (Tr. 89.)

On March 9, 2007, Nurse Practitioner Davenport wrote a second "To Whom It May Concern" letter.  In the letter, she noted that Allison suffered from fibromyalgia, and that her disease had proven resistant to most treatments.  In her opinion, Allison could not tolerate any level of employment without aggravating her condition.  (Tr. 564.)

On March 23, 2007, Davenport wrote a third "To Whom It May Concern" letter.  In the letter, she noted Allison suffered from daily fatigue, severe musculoskeletal pain, and pain in her hands, arms, neck, back, legs, and feet.  She believed Allison could only use her hands for five to ten minutes at a time.  (Tr. 576.)

On April 18, 2007, a MRI of the lumbar spine showed a small spinal arachnoid cyst.  Otherwise, there was normal alignment of the lumbar bodies, with no significant disk bulges, focal disk herniation, or significant central or foraminal stenosis at any level.  (Tr. 649.)

On June 5, 2007, Maxwell Lazinger, M.D., reviewed an x-ray of Allison's cervical spine.  The x-ray showed no evidence of any fracture, dislocation, or subluxation.  The disk space height was well-maintained, and the prevertebral soft tissues were unremarkable.  There was no acute pathology.  (Tr. 606.)

On June 6, 2007, Allison saw Dr. Jones, a day after being involved in a car accident.  A physical examination showed Allison was in no distress, and able to move her extremities, head, and neck okay.  Her back was mildly tender in the muscles.  Dr. Jones diagnosed her with elevated blood pressure that was resolved, and a  migraine headache, that appeared to be triggered by the accident, but that was doing better.  Dr. Jones told Allison she could take Ultram for the pain, and could also use Tylenol or Percocet as needed.  No additional treatment was needed for her blood pressure.  (Tr. 589-90.)

On June 8, 2007, Allison saw Nurse Practitioner Davenport.  A musculoskeletal exam showed Allison was pretty tender everywhere.  She had 18/18 tender points, with allodynia over the chest and lower back. Davenport diagnosed her with fibromyalgia, left forearm pain, and asthma.  She was in good spirits, all things considered, and felt the Zanaflex was helping her sleep.[26]  (Tr. 608-11.)

On June 11, 2007, Dr. Jones filled out a form for Allison to receive a handicapped sticker.  (Tr. 591.)

On August 1, 2007, Allison saw Nurse Practitioner Davenport, complaining of right hand pain.  She noted that her fibromyalgia discomfort was at normal levels.  Davenport diagnosed Allison with monoarthritis and worried that she might have damaged her hands in the car accident.  She also diagnosed her with fibromyalgia, which was stable.  The Zanaflex was fairly helpful for her pain, and also helped her sleep.  Allison was now doing things outside the house for five- to ten-minute periods.  Davenport encouraged her to get out and do things with her family, and recommended daily exercise.  (Tr. 612-15.)

On August 6, 2007, an MRI of Allison's right hand revealed a solitary cystic lesion, but otherwise, the radial and ulnar collateral ligaments of the metacarpal joint were normal.  The other metacarpal and carpometacarpal joints were normal.  (Tr. 651-52.)

On August 9, 2007, Allison saw Nurse Practitioner Davenport, complaining of severe hand pain ever since her car accident.  An examination by Dr. Jones showed no inflammation and only tenderness. An MRI of the hand showed a small cystic lesion, but Davenport did not think this was the result of an injury.  There was also no evidence of any early inflammatory arthritis.  Davenport diagnosed Allison with fibromyalgia, which was stable.  Allison was sleeping okay, and noted that the Zanaflex was helpful for her pain and stiffness.  She still was not exercising regularly.  (Tr. 616-19.)

On August 22, 2007, Allison saw Matthew Anderson, M.D., complaining of right hand pain.  A physical examination showed Allison had no

---

[26]Zanaflex is used to treat muscle tightness and cramping (spasm) caused by conditions such as multiple sclerosis or spinal injury. WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

deformity at her metacarpophalangeal joints or proximal interphalangeal joints. She had full composite flexion and extension of the digits. Tests for carpal tunnel were negative, there was no locking or clicking, and there was no joint effusion. X-rays of the hand showed no fractures or arthritis. Dr. Anderson believed the pain was due to tendinitis, and not to the cystic defect. (Tr. 636-39.)

On September 19, 2007, Allison saw Dr. Jones. Her father had recently died. She had anxiety and depression, but no suicidal thoughts. Her asthma was stable, and she denied any chest pain, breathing complaints, or abdominal pain. Dr. Jones diagnosed her with diabetes, but not compliant with her diet, hyperlipidemia, stable asthma, stable anxiety and depression, and obesity. (Tr. 596-97.)

On December 14, 2007, Allison saw Robert Conway, M.D., complaining of lower lumbar pain and neck pain. In taking her history, Dr. Conway noted that Allison smoked a pack a day, and exercised about three times a week, though "it [was] a fairly minimal workout." A musculoskeletal examination showed Allison had moderately decreased cervical range of motion, but that she had 5/5 strength in the upper extremities, and normal strength of the ankle dorsiflexors. Dr. Conway diagnosed her with fibromyalgia and depression, and recommended that she get involved in a regular aerobic condition program, primarily walking. He asked her to walk at least thirty minutes a day. (Tr. 630-32.)

On December 28, 2007, Allison complained of increased neck pain, stemming from her car accident. An x-ray of the cervical spine showed no evidence of a fracture or of significant degenerative changes. (Tr. 654-55.)

On December 31, 2007, Allison saw Nurse Practitioner Davenport, complaining of a fibromyalgia flare, and pain all over. Davenport noted that Allison had allodynia to touch everywhere, but that there was no clear triggering stressor or activity. (Tr. 623-26.)

**Testimony at the Hearing**

On March 13, 2007, Allison testified before the ALJ. On April 18, 2005, Allison went into work, but was in such pain that even sitting was difficult. Beyond that, her bosses had told her that she had been

making high-dollar mistakes, and that she needed to go to the doctor. When she went to see Dr. Jones, he referred her to a rheumatologist, who diagnosed her with fibromyalgia. The pain was present every day, but moved around, though it was always in her back. The pain in her back was sharp and constant, and sometimes even excruciating. Her doctors gave her muscle relaxers – and not pain pills – because they did not want her to develop an addiction. Sitting and standing for too long, and walking long distances aggravated her back problems. Allison thought she could only sit, stand or walk for about twenty minutes before needing to rest. Lying down and stretching helped her back, and she would do that several times a day, for between thirty and sixty minutes at a time. (Tr. 663-72.)

Allison also experienced arm problems, though not every day. Her arms felt weak, and she had difficulty lifting things. She needed her daughter to comb her hair and fasten her bra. Typing produced a severe pain in her wrist, arms, and hands. She did not think she could lift more than ten pounds. Her arm problems also made writing and holding things difficult. Allison did the dishes, but needed to rest after ten or fifteen minutes. Her daughter vacuumed and her neighbor helped with the cooking. She experienced severe pain in the right shoulder, and tried to perform exercises because Medicaid would no longer pay for her physical therapy. (Tr. 672-75.)

Allison experienced headaches every day. She had undergone sinus surgery, which helped, but she still had a dull headache all the time. Even after the sinus surgery, she still had some problems breathing. Allison suffered from asthma, and took Singulair, Flovent, and Albuterol. She was no longer taking Prednisone. (Tr. 675-77.)

Allison had always suffered from depression, but it had gotten worse since she was no longer able to work. Her depression made her pull out her eyelashes and made it difficult to be around people. She had anxiety, crying spells, and low energy. She hated having to depend on her daughter. She received counseling for her depression and anxiety, and took Cymbalta, Lorazepam, Paxil, Trazodone, and

Amitriptyline.[27]  Allison took Trazodone and Amitriptyline to help her sleep, but she still woke up because of her back or leg pain.  The medication made Allison tired and sick to her stomach.  (Tr. 677-80.)

Allison had carpal tunnel surgery in 1995, but was able to return to work following the surgery.  She had three nose surgeries – one for a deviated septum, and the other two for polyps.  She underwent five knee surgeries.  She still had pain in her knees, but was no longer being treated for knee pain.  Allison could not remember whether she had been to the emergency room at any point in the last twelve months.  Allison tried to exercise on her own, but the exercise did not help relieve her fibromyalgia pain.  She had diabetes, and needed to prick her finger in the morning.  The fibromyalgia, asthma, and diabetes were the main impairments preventing Allison from working.  (680-86.)

Allison had one brother recently released from prison, and another who drank.  She was no longer with her fiancé, but had been more depressed with him than she was without him.  Allison started getting counseling a little bit after 1993.  She had never been hospitalized for her emotional problems.  She had contemplated suicide once, but did not have any hallucinations.  She had anxiety every day, and suffered anxiety attacks if she had to go out.  The attacks lasted until her medicine took effect, which was about thirty minutes.  During an attack, Allison felt like she was shaking, felt sick to her stomach, and could not breathe.  She had crying spells every day, and they lasted about thirty minutes.  (Tr. 686-92.)

Allison lived in her father's house with her daughter.  Her daughter cleaned the house.  Allison did not cook or do any yard work, but she was able to drive.  Welfare was her only source of income.  Nurse Practitioner Davenport worked at the rheumatologist's office, and was a family nurse practitioner (FNP), and an advanced practice registered nurse (APRN).  Allison had been seeing Davenport since April 2005, and saw her once every two or three months.  Davenport prescribed medication.  Allison had only seen the doctor in that office three times since 2005.  (Tr. 692-99.)

---

[27]Amitriptyline is used to treat depression.  WebMD, http://www.webmd.com/drugs (last visited April 27, 2010).

Lesa Keen testified as a vocational expert (VE) during the hearing. The ALJ had the VE assume that Allison could perform the full range of sedentary work, but noted that the job needed to be something simple, routine, and repetitive, and as stress-free as possible. The ALJ also had the VE take note of Allison's obesity. The ALJ further noted that Allison could occasionally bend, but could not crawl, kneel, or squat. Because of her shoulder surgeries, she could not perform any repetitive overhead lifting or reaching. She also required a sit-stand option, a clean environment because of her asthma, a job that did not require fine hand dexterity, and limited contact with the public, but not co-workers and supervisors. Given these limitations, the VE testified that Allison could not perform her past work. However, the VE testified that Allison could perform work as a surveillance systems monitor (DOT #379.367-010). According to the VE, that job was sedentary, unskilled, and had a sit-stand option. The VE also testified that Allison could perform the job of credit checker (DOT #237.367-014) and document preparer (DOT 3249.587-018.) If the VE accepted the mental RFC from Steve Smith on February 19, 2007, the VE testified that Allison could not perform any work. Allison saw Smith twice a month. (Tr. 699-706.)

The surveillance job rarely required use of arms and hands. The document preparer job required someone to remove paper clamps throughout the day. That job required frequent use of the hands. The credit checker job required occasional hand use. If Allison needed to lie down several times a day because of pain and fatigue, the VE testified that she would not be able to perform any jobs. (Tr. 706-09.)

### III.  DECISION OF THE ALJ

The ALJ followed the five-step procedure in reaching a decision. At Step One, the ALJ determined that Allison had not engaged in substantial gainful activity since the alleged onset date. At Step Two, the ALJ found Allison suffered from fibromyalgia, asthma, non-insulin dependent diabetes, GERD, epicondylitis, a history of hand surgery, a history of sinusitis and sinus surgery, scoliosis, rotator cuff tendonosis and bursitis, shoulder surgeries, headaches, obesity, panic disorder, and depression. The ALJ found these impairments were severe.

The ALJ found Allison's other impairments not to be severe. At Step Three, the ALJ found that these impairments did not satisfy a listed impairment. (Tr. 10, 20.)

At Step Four, the ALJ found Allison had the residual functional capacity (RFC) to occasionally and frequently lift and carry ten pounds, push and/or pull up to ten pounds, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday, with an option to alternate sitting and standing at will. The ALJ also found Allison had the RFC to perform only simple, routine, and repetitive work in an environment as stress-free as possible. She could not crawl, kneel, squat, reach overhead, or perform fine hand work. She could occasionally bend, had to work in a clean environment with no temperature extremes, avoid direct sunlight, and have only limited contact with the consuming public. Under the circumstances, the ALJ found Allison could not perform her past work. At Step Five, the ALJ relied on testimony from the VE to conclude that Allison could perform a substantial number of sedentary and unskilled jobs in the national economy. Accordingly, the ALJ concluded Allison was not disabled within the meaning of the Social Security Act at Step Five. (Tr. 20-21.)

In reaching this decision, the ALJ noted that Allison had a long history of medical treatment. In particular, the ALJ focused on the medical reports from Dr. Jones, Allison's primary care physician. In these reports, Dr. Jones found Allison to be non-compliant with treatment and medication, and continually encouraged her to stop smoking and to lose weight. In another report, Allison reported quitting her job because of stress, even though she liked her job and needed the income. Allison declined mental health counseling on several occasions, and also declined to be referred to a dietician. Medical reports and x-rays showed Allison's lumbar spine and knees were normal. During one medical visit, Allison reported that she was working, even though she had represented that she had stopped working two weeks earlier. She received conservative treatment from Dr. Ravi Yarlagadda, a neurologist, and from Dr. Robert Fisher, a pain specialist. (Tr. 9-15.)

When Allison finally agreed to a mental evaluation, she received GAF scores that ranged from 50 to 55. During one visit, she reported

that she was not having any mood swings or complaints of depression. The ALJ found Allison suffered from medically determinable mental impairments. Following the federal regulations, the ALJ concluded Allison had a mild limitation in her daily living activities, a moderate limitation in social functioning, a mild limitation in the area of concentration, persistence, or pace, and no episodes of decompensation. (Tr. 15-17.)

The ALJ found Allison not credible. In his opinion, the evidence showed her impairments were not as limiting as alleged, and that she had the ability to perform at least sedentary work. In particular, the ALJ noted Allison's history of noncompliance, particularly her failure to quit smoking, her failure to exercise and lose weight, and her failure to take her medication as prescribed. The ALJ noted Allison had a good work history, but that her physical and mental impairments seemed largely under control. The ALJ also noted inconsistent statements and a lack of candor by Allison. The ALJ discounted the letters by Nurse Practitioner Davenport. He found the letters were merely legal opinions and were supported by little evidence in the record. The ALJ also discounted the opinion of the social work counselor, Steve Smith, as inconsistent with his own treatment notes, and inconsistent with the GAF scores from Dr. Hall. (Tr. 17-19.)

Relying on the testimony from the VE, the ALJ concluded that Allison could not perform her past work, but that she had the residual functional capacity (RFC) to perform work in the national economy. Specifically, he found Allison could perform sedentary, unskilled jobs, such as surveillance system monitor (DOT #379.367-010), credit checker (DOT #237.367-014), and document preparer (DOT #249.587-018). Accordingly, the ALJ found Allison was not disabled within the meaning of the Social Security Act. (Tr. 19-21.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th

Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Allison could not perform her past work, but that she retained the RFC to perform other jobs in the national economy.

## V.  DISCUSSION

Allison argues the ALJ's decision is not supported by substantial evidence.  In particular, she argues the ALJ failed to properly weigh the opinions of her treating physicians.  She argues that the ALJ should have relied on the opinions of Dr. John Hall and Nurse Practitioner Deanna Davenport.  (Doc. 16.)

**Weighing Medical Testimony**

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1219 (8th Cir. 2001).  The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole.  <u>Id.</u>  Normally, the opinion of the treating physician is entitled to substantial weight. <u>Casey v. Astrue</u>, 503 F.3d 687, 691 (8th Cir. 2007).  The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight.  <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data.  <u>Casey</u>, 503 F.3d at 691.  The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent.  <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 803 (8th Cir. 2005); <u>Cantrell v. Apfel</u>, 231 F.3d 1104, 1107 (8th Cir. 2000).  In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations.  <u>Casey</u>, 503 F.3d at 692.

In this case, the ALJ discounted the letters by Nurse Practitioner Davenport and the opinions of the social work counselor, Steve Smith. (Tr. 18-19.)  Substantial evidence supports this decision.

In her three letters, Nurse Practitioner Davenport concluded that Allison was disabled, that no treatments could remedy her condition, and that she could not work.  These letters amounted to legal conclusions

as to whether Allison was disabled or unable to work -- the type of determinations reserved solely for the Commissioner.  <u>Dean v. Astrue</u>, No. 08-5092-CV-SW-NKLSSA, 2009 WL 1765196, at *5 (W.D. Mo. June 22, 2009).  Accordingly these types of legal conclusions are not conclusive on the ultimate question of disability.  <u>Id.</u>

In addition, the ALJ properly noted that Nurse Practitioner Davenport was not a treating physician, whose opinions could establish a medically determinable impairment.  Under the regulations, evidence from acceptable medical sources is necessary to prove a claimant suffers from a medically determinable impairment.  <u>Crowder v. Astrue</u>, No. 4:08 CV 1603 FRB, 2010 WL 559131, at *7 (E.D. Mo. Feb. 10, 2010) (citing 20 C.F.R. § 416.913(a)).  Acceptable medical sources include licensed physicians, licensed or certified psychologists, and licensed or certified individuals performing the functions of a school psychologist in a school setting.  <u>Id.</u>  Information from "other sources" such as nurse practitioners and physicians' assistants, may be used to show the severity of an impairment or how the impairment affects a claimant's ability to work, but it cannot be used to establish the existence of a medically determinable impairment.  <u>Id.</u>  The ALJ recognized, and properly applied, this standard.

More to the point, Davenport's conclusions were inconsistent with her own findings and with the medical evidence in the record.  In April 2005, Davenport noted that x-rays of the lumbar spine showed no fractures and revealed the disk spaces were relatively well preserved. (Tr. 238.)  In May 2005, Davenport found that Allison had no swelling or tenderness in the joints of her hands or wrists, and no elbow tenderness or reduced range of motion.  (Tr. 113.)  In August 2005, Davenport noted a recent sleep study showed no apnea, and that Allison's appearance was calmer and there were signs of improvement in how she was dealing with her condition. (Tr. 472.)  In December 2005, Allison told Dr. Jones she had no chest pain, no breathing trouble, no abdominal pain, no leg swelling, and no dizziness. (Tr. 432.)  X-rays and MRIs of her back showed no bony injuries, no focal disk herniation, normal alignment, and no significant compromise of the spinal canal or neural foramina. (Tr. 306, 545-46.)  In November 2006, Davenport noted that

Allison's fibromyalgia was stable, her sleep was improved, and her mood was stable. (Tr. 494.) In December 2006, Dr. Yarlagadda found Allison had full motor strength in all four extremities. (Tr. 526.) In August 2007, Dr. Anderson found Allison had no deformities in the joints of her hand, and was negative for carpal tunnel syndrome. (Tr. 637-38.) That same month, Davenport encouraged Allison to exercise and things with her family, and noted that she was working outside the house in five- to ten-minute periods. (Tr. 614.) Finally, in December 2007, Dr. Conway encouraged Allison to get involved in a regular aerobic conditioning program, and to walk at least thirty minutes a day. (Tr. 632.) Under the circumstances, the ALJ properly weighed Nurse Practitioner Davenport's testimony.

The ALJ discounted the medical assessment of Steve Smith (Tr. 364-65) as inconsistent with his own treatment notes, inconsistent with the GAF scores assigned by Dr. Hall, and inconsistent with other medical evidence in the record. (Tr. 19.) Substantial evidence supports this determination.

In June 2004, Allison told Dr. Jones she was no longer taking her depression medication because she was doing well. (Tr. 143.) In December 2004, Dr. Jones offered counseling, but Allison declined. (Tr. 133.) In February 2005, Allison told Dr. Jones her depression and anxiety were asymptomatic. (Tr. 130.) In March 2005, Allison went on a trip to the Smoky Mountains. (Tr. 126.) In October 2005, Allison reported having a good relationship with her daughter, and going to two church youth groups. (Tr. 287.) In June 2006, Smith noted that Allison showed significant resilience, was not suicidal, and had a significant understanding of her illness. He assigned her to the second-lowest level of care. (Tr. 318.) The next month, Allison went on a two-day trip to Springfield with her daughter. According to Smith, she appeared more relaxed and more comfortable about being out in public. (Tr. 333.) In August 2006, she told Dr. Jones that she was not having any mood swings and had no complaints related to depression. (Tr. 441.) In September 2006, Allison volunteered at a concession stand. (Tr. 443.) In October 2006, Dr. Fisher found Allison appeared to have normal recall abilities and normal speech. (Tr. 534.) In December 2006, Dr.

Yarlagadda found her attention and concentration were intact, her language was fluent, and that she had good comprehension and repetition. (Tr. 525-26.) That same month, Smith indicated Allison was feeling more relaxed and not crying. (Tr. 326.) In January 2008, Allison told Dr. Jones she was doing well with her depression, and that she had no anxiety or panic attacks. (Tr. 599.) Looking to the medical record, the ALJ properly discounted the medical assessment of Steve Smith as inconsistent with his own treatment notes and inconsistent with other medical evidence in the record.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections may waive the right to appeal issues of fact.


      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on May 5, 2010.